J-A07031-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| RODNEY HOWARD, JR., | : | |
| | : | |
| Appellee | : | No. 1771 WDA 2015 |

Appeal from the Order Entered November 3, 2015
in the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0013050-2014

BEFORE:  OLSON, STABILE, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:  **FILED JUNE 21, 2017**

The Commonwealth of Pennsylvania appeals from the November 3, 2015 order granting the motion to suppress filed by Rodney Howard, Jr. (Howard).  We affirm.

The suppression court summarized the underlying facts and history of this case as follows.

> [Howard] was charged with criminal homicide and person[s] not to possess a firearm [related to a] shooting [which resulted in] the death of Hosea Davis on January 20, 2014. [Howard] was arrested on September 18, 2014.  [Howard's] preliminary hearing took place on September 26, 2014[,] at which time he was represented by counsel. … After his arrest and while in the Allegheny County [J]ail awaiting trial and also later in a federal facility in Ohio, [Howard] came into contact with another inmate, Kendall Mikell [(Mikell)].  Mikell and [Howard] had known each other for years.
>
> Prior to trial, [Howard] filed a pretrial motion in which he alleged that the Commonwealth intended to call Mikell as a witness to testify regarding alleged incriminating statements

*Retired Senior Judge assigned to the Superior Court.

made by [Howard] to Mikell while both were inmates at the Allegheny County Jail and in the federal facility. … [Howard's] motion alleged that Mikell was an agent of the prosecution throughout the period in question, and the prosecution's use of him to elicit statements from [Howard] violated [Howard's] Sixth Amendment right to counsel, relying on ***Massiah v. United States***, 377 U.S. 201 [] (1964) and ***Commonwealth v. Moose***, 602 A.2d 1265 [(Pa. 1992)].

A hearing on the suppression motion was held on November 2, 2015. At the hearing, Mikell, who was 28 years old, testified that he [had known Howard] since they were 9 or 10 years old and they had gone to school together. He testified that in July of 2013 he was lodged in the Allegheny County Jail as the result of federal charges for conspiracy to possess a firearm and remained there until approximately January of 2015. As of the date of the hearing, Mikell had [pled] guilty to the federal charges but had not yet been sentenced. He denied that any promises with respect to his charges had been made to him in exchange for his testimony against [Howard].

[Mikell] testified while in the Allegheny County Jail with [Howard], from October to December 2014, he talked with [Howard] on a daily basis as they were both in the same pod. He testified that he was aware that [Howard] was in jail on homicide charges. He also acknowledged that he talked with [Howard] about the charges and that he obtained information that [Howard] allegedly told him regarding the murder including: information regarding one of the witnesses to the murder; [Howard's] motives; that [Howard] used an assault weapon; where [Howard] was when he learned of the victim's location on the night of the murder; that [Howard] wore a mask when he got to the location; that [Howard] saw his father and an uncle at the scene of the murder; that [Howard] got very close to the victim and shot him 14 times; that [Howard] then fled to McKeesport and later to New York where he stayed for months; and, discussions that [Howard] then had with his attorney, including possible defenses.

Mikell acknowledged that … in December 2014 [he met] with law enforcement but denied that prior to that meeting he had been asked by any law enforcement to obtain information from anyone in jail. He testified that when he first met with law enforcement agents it was a result of his writing to an agent on

his case and he was not instructed to return to jail and obtain any information from other inmates. Mikell also acknowledged that he was with [Howard] not only in the Allegheny County jail but also at a federal facility and also talked to [Howard] while at that facility[;] however[, Mikell] was transferred from that facility for his own safety.

Mikell testified that he had another meeting with law enforcement in May of 2015 and provided an audio statement but there was no new information from [Howard] that he [had not already] told them in the December 2014 meeting. Mikell also acknowledged that he testified or provided information to state or federal authorities in cases involving Samuel Mitchell, William McGraw and Henry Little-Proctor. He testified that he first came forward to provide information "to get consideration for a time cut" but when he realized that he was not going to be classified as a career criminal for federal sentencing purposes, he did not want to testify out of concern for his own safety. Mikell testified, however, that he changed his mind about testifying about [Howard] when he learned of statements made by [Davis's] mother about [Davis's] daughters and that [Howard] was a danger to the community. Mikell testified that he was "touched" and he informed his lawyer that he would come forward with the information about [Howard].

On cross examination, Mikell acknowledged that when he first came forward with information it was in order to get consideration on his sentence. He testified that when he first sent a letter to law enforcement about providing information it concerned the shooting death of Susan Sidney … and a suspect in that case, Henry Little-Proctor. This first meeting took place on July 17, 2014 and that it was information that he allegedly received from Little-Proctor while they were in adjoining cells in jail. As a result of that meeting he discussed getting a "5(k)" or a recommendation from the federal authorities regarding a downward deviation in his sentencing guidelines. He also acknowledged that after leaving the July 17, 2014 meeting he returned to the county jail and received more information from Little-Proctor regarding the Susan Sidney murder. Ultimately the December 2014 meeting was set up with law enforcement and he provided them with additional information. He also supplied them with the information that he had received from [Howard].

Mikell also indicated that he believed that there [were] other meetings with law enforcement between July and December 2014 concerning Samuel Mitchell. Mikell testified that after the December 2014 meeting he then returned to the county jail and talked with [Howard] again. He denied, however, that he agreed at the December 2014 meeting to provide information regarding the murder that [Howard] was charged with. When specifically asked if he had an agreement in the fall of 2014 with law enforcement to provide information on Little-Proctor, Mitchell and [Howard], Mikell denied any agreement stating: "I didn't sign no agreement until after everything." He again acknowledged that when he contacted law enforcement that he was trying to get a sentence reduction and that when he was in the jail he was trying to get information to provide to the government.

Mikell also testified that after the December 23, 2014 meeting with the prosecutor he returned to the county jail where he was still housed with [Howard] until [Howard] was sent to "the hole" about two weeks later. Mikell also acknowledged that [Howard] was transferred to a federal facility in Ohio and that he was later transferred to the same facility and was housed on the same block, where he again had contact with [Howard]. He testified that while at the Ohio facility he learned additional information about [Howard's] defense in a different federal case, but testified that he did learn that the Davis murder was allegedly motivated by [Howard's] desire to "take over the east side" and that "he wanted to make an example out of the victim." He also indicated that he "learned a lot of things" about the murder case but [stated on the stand "n]othing I can pull out of my brain off the top."

Mikell acknowledged that there was a third meeting with law enforcement on May 28, 2015[,] but that information regarding firearms, pills and drugs being stolen from [Howard] had been previously supplied in the December meeting. … On redirect, Mikell testified that he did not provide any new information to law enforcement in the May 2015 meeting that he had not already supplied in the December 2014 meeting.

Near the conclusion of the suppression hearing[,] defense counsel, who was seeking to establish the different information given by Mikell to law enforcement in the various meetings[,] indicated that "[Detective] Boose is going to have to be here,"

- 4 -

and referenced differences in the detective's report regarding the information supplied by Mikell at the various meetings. The scheduling of Detective Boose's testimony was then discussed, along with the possible testimony of two other detectives. In addition, argument on the motion was received. On November 3, 2015, upon consideration of the testimony from the suppression hearing, the motion to suppress was granted. The Commonwealth filed a [motion for reconsideration,] which was denied after a hearing on November 5, 2015.

Suppression Court Opinion, 7/21/2016, at 2-7 (record citations omitted).

This timely-filed appeal followed.[1]

The Commonwealth presents one issue for this Court's review: "Whether the [suppression] court erred finding that the Commonwealth's proffered jailhouse witness was acting as an agent of the government when he obtained inculpatory statements from [Howard], in violation of [Howard's] Sixth Amendment right to counsel?"[2] Commonwealth's Brief at 7.

We consider the Commonwealth's issue mindful of the following.

When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review. We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn

---

[1] Both the suppression court and the Commonwealth have complied with Pa.R.A.P. 1925.

[2] In its brief, the Commonwealth presented a second issue originally challenging the trial court's exclusion of a statement pursuant to the hearsay rule. However, at oral argument, counsel for the Commonwealth notified this Court that the Commonwealth was withdrawing that issue.

from those findings. In appeals where there is no meaningful dispute of fact, as in the case *sub judice*, our duty is to determine whether the suppression court properly applied the law to the facts of the case.

***Commonwealth v. Gorbea-Lespier***, 66 A.3d 382, 385-86 (Pa. Super. 2013) (quotation marks and citations omitted).

As the issue in this case also implicates a defendant's right to counsel, we observe the following.

The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. … [T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever — by luck or happenstance — the State obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

***Maine v. Moulton***, 474 U.S. 159, 176 (1985) (internal citation removed).

***See also Massiah v. United States***, 377 U.S. 201 (1964); ***United States v. Henry***, 447 U.S. 264 (1980).

In ***Commonwealth v. Moose***, 602 A.2d 1265 (Pa. 1992), the Pennsylvania Supreme Court applied ***Massiah***, ***Henry***, and ***Moulton*** to a situation where an informant obtained incriminating information from fellow

inmates, including Moose, pursuant to an "implied understanding" with the district attorney. The informant "was called the 'monsignor' because so many inmates allegedly confessed to him." *Id.* at 1270. During a post-trial hearing, the district attorney admitted that the informant had been kept in the county jail for three years because he was supplying the district attorney's office with information about various inmates. *Id.* The district attorney further admitted that he planned to make the informant's cooperation known at the time of his sentencing, but denied instructing the informant to gather information. *Id.*

Nevertheless, the Court concluded that the informant was a government agent, emphasizing the government's repeated deferral of his sentencing every time he produced a new confession and the district attorney's plan to give a lenient recommendation at his sentencing. *Id.* at 1270-71. "Although the district attorney may have not given [the informant] specific instructions, it is clear that [the informant] was well aware of what he had to do while in jail to get a good recommendation at his sentencing." *Id*. The government was not required to place an informant in the jail with a specific target in mind; it was enough that the "Commonwealth intentionally left him there to harvest information from **anyone** charged with a crime and awaiting trial." *Id.* (emphasis added). Moreover, the informant questioned Moose in a manner designed to elicit incriminating information, such as asking him whose knife was used to kill

the victim, making the situation "distinguishable from the case in which an inmate unexpectedly comes forward with incriminating information about a fellow inmate … or where an informant is a passive listener to a heartfelt confession." *Id.* at 1270 (citations omitted). The above facts convinced the Court that the Commonwealth knowingly circumvented Moose's Sixth Amendment right to counsel, warranting a new trial. *Id.*

Six years later, our Supreme Court confronted a similar situation. *See Commonwealth v. Franciscus*, 710 A.2d 1112, 1119 (Pa. 1998). In *Franciscus*, Daniel Krushinski, who was in jail awaiting sentencing, initiated contact with police to inform them that he had information about a fellow inmate's role in an armed robbery, and later met with police detectives to provide them with the information. *Id.* at 1113-14. Subsequently, police detectives held a second meeting with Krushinski, this time with an assistant district attorney in attendance, and the law enforcement officials agreed they would be available upon request to testify that Krushinski had provided information to them in the armed robbery prosecution. *Id.* at 1114. Although not part of the express agreement, after the meeting the police deposited $45.00 into Krushinski's prison account so that Krushinski could maintain the façade amongst his fellow inmates that he had connections on the outside. *Id.*

Next, Krushinski contacted a police lieutenant and offered to provide him with information involving a second inmate. *Id.* After obtaining the

information from Krushinski, the lieutenant agreed to testify about his cooperation when requested. *Id.* Inmates learned Krushinski was providing information to the police and assaulted him. *Id.* Krushinski contacted the lieutenant, who assisted Krushinski with transferring him to maximum security for his safety and gave Krushinski his home telephone number. *Id.*

While in maximum security, Krushinski and Franciscus were separated by one cell. *Id.* at 1115. Krushinski "immediately engaged" Franciscus in conversations by "relentlessly questioning [him] about the details of the homicide charge" on which he was being held and offered his assistance based upon Krushinski's alleged connections outside of prison. *Id.* Five days after his transfer to maximum security, Krushinski requested that his attorney contact a state police trooper investigating the murder with which Franciscus had been charged so that he could provide the trooper with information he obtained from Franciscus. *Id*. The trooper arranged a meeting between herself, Krushinski, and the district attorney who was prosecuting the case for that same day. *Id.* Prior to Franciscus's trial, Krushinski pled guilty to his pending charges, and four police officers, including two investigating the murder with which Franciscus had been charged, appeared to testify regarding the assistance that Krushinski had provided in the three cases. *Id.*

On appeal, the Pennsylvania Supreme Court found the facts to be similar to those evaluated in *Moose*.

Although Krushinski's initial contacts with the Pennsylvania State Police and local police in connection with the [armed robbery] matter were unexpected, Krushinski's subsequent agreement with them that they would inform the [sentencing court] of his cooperation at the time of his sentencing altered their relationship. The subsequent contacts and information provided by Krushinski must be viewed in the context of the agreement.

*Id.* at 1120. The Court concluded that notwithstanding the police's lack of instructions to target any particular inmate, Krushinski was encouraged to obtain whatever useful information he could in exchange for a reward, and a new trial was warranted due to the Commonwealth knowingly circumventing Franciscus's right to counsel under the Sixth Amendment and Article I, Section 9 of the Pennsylvania Constitution. *Id.* at 1120-21.

In the instant case, the Commonwealth contends that ***Moose*** is not controlling because Mikell was trying to "curry favor with the government" by providing information on his own accord and the government never conveyed an implied agreement to assist Mikell if he provided information to them. Commonwealth's Brief at 19.

There is no dispute that, initially, Mikell came forward on his own and offered to provide information on the Little-Proctor case. Following the initial meeting in July 2014, however, in the suppression court's view,

there was an understanding on Mikell's part that providing information to law enforcement regarding various inmates could be valuable in seeking a recommendation for a sentence reduction. In addition, it is clear that law enforcement conveyed to Mikell, at least by implication, that it was willing to receive information regarding various inmates, as it did not only on Little-Proctor, but also on Mitchell, McGraw and [Howard].

Suppression Court Opinion, 7/21/2016, at 9. The suppression court found "Mikell was well aware of what he had to do while in jail," and, although the government may not have instructed Mikell to obtain information regarding Howard specifically, there was still an implied agreement that Mikell should obtain information from inmates generally in exchange for a potential sentence reduction. *Id.* The suppression court also pointed to Mikell's transfer to the federal facility shortly after Howard was transferred there, indicating that the Commonwealth was willing to facilitate interaction between them. *Id.* at 10. Based on these facts, the suppression court concluded that Mikell had been acting as a government agent since July 2014 and at all times when he elicited information from Howard.

Although the Commonwealth may not have gone quite as far as it did in *Moose* by keeping an informant in jail for years, or in *Franciscus* by providing direct payments to an informant, the suppression court's determination that the Commonwealth and Mikell had an implied agreement is supported by the record.

As our Supreme Court has recognized, direct proof of the Commonwealth's knowledge is seldom available, but proof that the Commonwealth must have known its agent was likely to obtain incriminating statements from the accused in the absence of counsel is enough. *Moose*, 602 A.2d at 1270 (citing *Moulton*, 474 U.S. at 176 n.12 (Brennan, J., concurring)). While initially Mikell approached the Commonwealth with

information about Little-Proctor on his own accord, he subsequently provided information about three other defendants, including Howard. Mikell admitted to questioning Howard repeatedly about aspects of his case, such as asking him why he did it, over the course of multiple conversations. N.T., 11/2/2015, at 22-25. The information Mikell obtained from Howard was detailed and extensive. The Commonwealth stayed in contact with Mikell regarding the information he obtained from various inmates, meeting with him at least three times and on other unspecified occasions.

In these circumstances, it is reasonable to conclude the government implicitly encouraged Mikell to elicit deliberately information from other inmates, thereby fostering his hope that his efforts would pay off in the form of a lenient recommendation down the road. In *Franciscus*, it was of no significance that it was the informant who initiated contact with the government each time he obtained information about a new defendant, because the government condoned the informant's methods by continuing to meet with the informant, thereby implicitly encouraging him to keep going. Similarly, in *Moose*, the government acquiesced in the informant's harvesting of information from multiple defendants over time. The sheer number of "confessions" obtained by Mikell indicates that Mikell was not merely a passive listener or the unexpected recipient of incriminating information. *C.f. Commonwealth v. Hannibal*, 156 A.3d 197 (Pa. 2016) (holding there was no government agency where the informant came

forward on his own initiative after his cellmate came to him for advice and opinions and subsequently confessed to killing the informant's acquaintance, even if the government later agreed to provide testimony about informant's cooperation to sentencing court).

The Commonwealth argues that the federal government, not the Commonwealth, directed Mikell and Howard's movements back and forth to federal prison. Commonwealth's Brief at 18 (citing various federal regulations). However, considering that federal and state officials were present in the July and December 2014 meetings, *see* N.T., 11/2/2015, at 44, 49, 57, the suppression court was justified in inferring that the Commonwealth helped facilitate Mikell's continued proximity to Howard in federal prison.

Finally, the Commonwealth contends it "sought to call the relevant law enforcement officers to make its case that it did not manipulate Mikell" into obtaining information from Howard and the suppression court "denied the Commonwealth that opportunity." Commonwealth's Brief at 20. The record indicates, however, that the Commonwealth never requested an opportunity to present the testimony of the police officers until it filed a motion for reconsideration after the suppression court issued its ruling. The only reason testimony of the police officers was contemplated at the suppression hearing was due to defense counsel's request. N.T., 11/2/2015, at 75.

Because the suppression court's factual findings are supported by the record, and the suppression court's inferences and legal conclusions drawn from those findings were reasonable, the suppression court did not err by suppressing Mikell's testimony.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/21/2017